**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**SANDY FRANK PRODUCTIONS LLC,**
a New York limited liability company,

                                                                Case No.

        Plaintiffs,

                                                                Hon.

v.

**MICHIGAN FILM OFFICE**, a governmental
agency, and **MICHIGAN DEPARTMENT OF**
**TREASURY, BUSINESS TAX DIVISION,** a
Governmental agency,

        Defendants.

_____/

DEBORAH K. SCHLUSSEL (P56420)
LAW OFFICE OF DEBBIE SCHLUSSEL
Attorney for Plaintiff
29477 Laurel Woods Drive
Southfield, MI  48034
(248) 354-1409

_____/

## COMPLAINT

        NOW COMES Plaintiff, SANDY FRANK PRODUCTIONS LLC, by and

through its attorney, DEBORAH K. SCHLUSSEL, and for its Complaint, states as

follows:

### PARTIES - PLAINTIFF

        1.   Sandy Frank Productions LLC (hereinafter referred to as, "SFP LLC") is a

New York limited liability company with its principal place of business located at 954

Lexington Avenue, Suite 200, in the City of New York, State of New York, with a postal

zip code of 10021.  SFP LLC is a related entity of  Sandy Frank Entertainment, Inc.

(hereinafter referred to as, "SFE, Inc.") and  Sandy Frank Film Syndication, Inc. (hereinafter referred to as, "SFFS, Inc.").  (Sandy Frank Productions LLC, Sandy Frank Entertainment, Inc., and Sandy Frank Film Syndication, Inc., may hereinafter be collectively referred to as the "Sandy Frank Entities.")

2.   Sandy Frank, the President and Chairman of both SFFS, Inc. and SFE, Inc. and the sole member of Sandy Frank Productions, LLC, is well known throughout the entertainment industry for his nearly five decades in creation, production, and syndication in television and film.  In addition to selling programming into syndication and broadcast prime time in the United States, he has sold, syndicated and/or otherwise distributed his television and film properties throughout the world, in over one hundred (100) separate and distinct countries worldwide.

3.   The programs for which Sandy Frank and the entities he controls are known include such well known stalwarts as, "Name that Tune," "You Asked For It," and "Face the Music."  He is also known for several well-known animated programs, including "Battle of the Planets," which he had the foresight and genius to buy and transform from the Japanese "Gatchaman."  Sandy Frank's long career in television and film also includes positions at Paramount Pictures and NBC.  A television industry icon, pioneer, and innovator, Sandy Frank, through the Sandy Frank Entities, operates the most successful and longest running privately-owned syndication business in the world.

**PARTIES - DEFENDANTS**

4.   Defendant Michigan Film Office (hereinafter referred to as the "MI Film") is

a governmental agency charged with overseeing the State of Michigan's Film Production Tax Credit (hereinafter referred to as the "Film Tax Credit"), as codified in MCL 208.1455, under the State of Michigan's Business Tax Act, MCL 208.1101 *et seq.* (hereinafter referred to as the "MBT").  MI Film is located at 300 North Washington Square, Fourth Floor, in the City of Lansing, State of Michigan, with a postal zip code of 48913.

5.   Defendant Michigan Department of Treasury (hereinafter referred to as, "Treasury") administers the MBT and oversees the Film Production Tax Credit, as codified in MCL 208.1455, pursuant to the MBT.  Defendant Treasury is located at Michigan Department of Treasury, in the City of Lansing, State of Michigan, with a postal zip code of 48922.

6.   Defendants MI Film and Treasury may hereinafter be collectively referred to as, "Defendants."

## JURISDICTION AND VENUE

7.   The amount in controversy exceeds the sum or value of $75,000 (Seventy-Five Thousand Dollars), exclusive of interest or costs.  Plaintiff is organized under the laws of State of New York and has its principal place of business in New York and the Defendants are both Michigan governmental agencies organized pursuant to the laws of the State of Michigan.  Therefore, there is complete diversity of citizenship, pursuant to 28 U.S.C. Section 1332(a)(1) and 28 U.S.C. 1332(c)(1).

8.   This action also presents various Constitutional, statutory, and common law

claims arising under the Fourteenth Amendment to the United States Constitution, the Michigan Constitution of 1963, the State of Michigan's Film Production Tax Credit, MCL 208.1455, the State of Michigan's Business Tax Act, MCL 208.1101 *et seq*., and the jurisdiction is conferred upon this Court, pursuant to 28 U.S.C., Section 1332.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. Section 1367.

9.    Plaintiff's claims for equitable, declaratory, and injunctive relief are authorized pursuant to 28 U.S.C., Sections 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

10. Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. Section 1391 because all Defendants reside within this district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this district.

11. Plaintiff has exhausted all available administrative remedies.

## GENERAL FACTUAL ALLEGATIONS

12.  Plaintiff re-alleges and incorporates by reference all prior paragraphs in this Complaint as though repeated herein.

13.  This lawsuit concerns breach of oral and implied contract, unjust enrichment, fraud, misrepresentation, and other causes of action committed by Defendant government agencies and their employees, agents, and representatives.  Plaintiff sustained several hundred thousand dollars in damages as a result of Defendants' conduct and that of their employees, agents and representatives.

14.  In April 2008, the Michigan Legislature passed the Michigan Film Production

4

Tax Credit, MCL 208.1455. The stated purpose of this statute, as discussed and debated on the floors of both chambers of the Michigan Legislature and by its proponents within and without the government of the State of Michigan was to promote and encourage increased production of various film, television, and other entertainment projects within the State of Michigan, in order to increase jobs for the citizens of the State of Michigan. The stated purpose of this statute was also to encourage companies to build studios and other infrastructure for a permanent, stable entertainment production industry within the State of Michigan to replace a dying automobile industry.

15. The stated intention of the Michigan Legislature was to create a tax credit and incentive that was greater and more generous than that offered in other States in the Union, thus encouraging producers and filmmakers to choose the State of Michigan over other States currently offering similar incentives. Pursuant to that goal, the Michigan Film Production Tax Credit provides up to Forty-Two Percent (42%) in tax credits on all qualified expenditures made in Michigan to entities which produce all or part of their specific entertainment projects within the State of Michigan. This includes film and television productions.

16. In 2009, Sandy Frank Productions LLC began planning production of a reality show and chose to make it almost entirely in Michigan, pursuant to the Michigan Film Tax Credit, despite prior approval of lucrative incentives from other states to make it elsewhere.

17. The reality show was a "Making Of . . ."-style production, showing a behind-the-scenes look at how a game show, "Face the Music," is developed and produced from conception to filming and production. The program was a reality show, not a game show.

5

The final product was, in fact, a reality show, showing how a game show host and contestants are auditioned and cast and how it is filmed and put together.  The final product is an entertaining look at production executives, casting agents, cast and crew, most of whom are Michigan residents and were Michigan-based.   It also includes scenes featuring executive producer Sandy Frank.

18. The Michigan Film Production Tax Credit, MCL 208.1455, specifically defines an "eligible production company" as "an entity in the business of producing qualified productions, but does not include an entity that is more than 30% owned, affiliated, or controlled by an entity or individual who is in default on a loan made by this state, a loan guaranteed by this state, or a loan made or guaranteed by any other state." Michigan Business Tax Act, Section 208.1455(12)(d).

19. SFP LLC is an "eligible production company," pursuant to Michigan Business Tax Act, MCL 208.1455, as it meets all elements of the definition as required in Michigan Business Tax Act, MCL 208.1455(12)(d), *supra*.  SFP LLC is an entity in the business of producing qualified productions, and is not more than 30% owned, affiliated, or controlled by an entity or individual who is in default on a loan made by the State of Michigan, a loan guaranteed by the State of Michigan, and/or a loan made or guaranteed by any other state.

20. The Michigan Film Production Tax Credit, MCL 208.1455, specifically defines a "qualified production" as a "single media or multimedia entertainment content created in whole or in part in this state for distribution or exhibition to the general public in 2 or more states by any means and media in any digital media format, film, or video tape, including but not limited to, a motion picture, a documentary, a television series, a

television miniseries, a television special, interstitial television programming, long-form television, interactive television, music videos, interactive games, video games, commercials, internet programming, an internet video, a sound recording, a video, digital animation, or an interactive website.  Qualified production also includes any trailer, pilot, video teaser, or demo created primarily to stimulate the sale, marketing, promotion, or exploitation of future investment in a production."  Michigan Business Tax Act, MCL 208.1455(12)(k).

21.  SFP LLC's "The Making Of . . ."/ "Face the Music" is a "qualified production," pursuant to Michigan Business Tax Act, MCL 208.1455, as it meets all elements of the definition as required in Michigan Business Tax Act, MCL 208.1455(12)(k), *supra*.  SFP LLC's "The Making Of . . ."/ "Face the Music" is single media or multimedia entertainment content created in whole or in part in the State of Michigan for distribution or exhibition to the general public in 2 or more states by any means and media in any digital media format, film, or video tape.  It is a video television series pilot, created primarily to stimulate the sale, marketing, promotion, or exploitation of future investment in a production.

22.  SFP LLC representatives and personnel, including member Sandy Frank and Rosalie Perrone, began their application process with the State of Michigan Film Office in mid-2009.  They were in frequent contact with Janet Lockwood, then the Director of MI Film, and her spokesman, Ken Droz, both of whom heavily courted SFP LLC representatives, both of whom induced SFP LLC to produce the show in Michigan with the promise that it would receive the Michigan Film Tax Credit for the production.

23.   Prior to contacting Michigan officials, SFP LLC's planned production was already approved for a Thirty Percent (30%) film tax credit/rebate in the State of Connecticut.  However, pursuant to the active persuasion, encouragement, and aggressive verbal promises of representatives and employees of the State of Michigan and MI Film personnel, including Ms. Lockwood, Mr. Droz and others, SFP LLC passed on the Thirty Percent (30%) film tax credit/rebate offer by the State of Connecticut.

24.   At every step of the way, Mr. Frank and other SFP LLC employees, agents, and representatives were assured by Ms. Lockwood, Mr. Droz and other officials of the State of Michigan that "The Making Of . . ." would be approved for the Michigan Film Tax Credit.

25.  Ms. Lockwood, Mr. Droz and other officials of the State of Michigan were repeatedly and emphatically informed by Mr. Frank and other SFP LLC employees, agents, and representatives that the planned production had already been approved by the State of Connecticut for its tax credit/rebate of Thirty Percent (30%), and they knew time was of the essence.  Lockwood, Droz, and other MI Film and State of Michigan employees actively encouraged Mr. Frank and SFP  LLC to make the production in Michigan instead, assuring Plaintiff it would be approved and that the application process was a mere formality.

26. Ms. Lockwood, Mr. Droz, and other MI Film and State of Michigan officials, employees, and representatives were informed that time was of the essence because SFP LLC needed to make economical use of a game show set at Grace and Wild Studios to fall around the same time as Jonathan Goodson Productions was producing a Michigan

State Lottery game show, as Jonathan Goodson Productions agreed to allow SFP LLC to use the same set for "The Making Of . . . ."

27. At all times relevant, Ms. Lockwood, Mr. Droz, and other State of Michigan officials encouraged Mr. Frank to go ahead with the planned production, as they assured him SFP LLC would be approved in time to make use of the game show set.  They were made aware that there was only a brief and fast approaching window in which to film the production, and they encouraged SFP LLC to make the commitments required to film the production quickly and immediately, including advanced payment of casting directors, a game show host, and the bulk of production costs.

28. At all times relevant, Ms. Lockwood, Mr. Droz, and other State of Michigan officials, agents, and representatives made verbal commitments constituting oral and implied contracts with representatives and officials of SFP LLC, committing to Michigan Film Tax Credit approval for "The Making Of . . . "/"Face the Music."

29. At all times relevant, Ms. Lockwood, Mr. Droz, MI Film, and the State of Michigan were made aware, verbally and through SFP LLC's application for the Michigan Film Tax Credit, that SFP LLC would commit to spending in the neighborhood of $300,000.00 to $400,000.00 in the State of Michigan pursuant to their assurances that SFP LLC would qualify for and receive the Michigan Film Tax Credit.

30.  After first being apprehensive and briefly, incorrectly assuming that "The Making Of . . . "/"Face The Music" was a game show, Lockwood acknowledged that it was, in fact, not a game show, but a reality show that was packaged solely and exclusively as a behind-the-scenes look at how such a show is produced.

31.  In fact, Ms. Lockwood and Mr. Droz, in their many phone conversations and e-mail contacts with SFP LLC, assisted SFP LLC in filling out the application, with Ms. Lockwood instructing SFP LLC personnel how to answer questions on the application to insure approval and repeating promises every step of the way that the application would certainly be approved.

32.  On September 18, 2009, SFP LLC submitted an application to MI Film and the State of Michigan Department of Treasury for its proposed project.

33.  Defendants were required to review the SFP LLC application for a film tax credit for the production of "The Making Of . . ." / "Face the Music," pursuant to the Michigan Business Tax Act, MCL 208.1455

34.  SFP LLC is not excluded under any of the specific exclusions stated in the Michigan Business Tax Act, MCL 208.1455 et seq.

35.  SFP LLC's "The Making Of . . ." / "Face the Music" that was the subject of the application is not and was not excluded under any of the specific exclusions from a qualified production as detailed in the Michigan Business Tax Act, MCL 208.1455(12)(k)(i) through (xiv).

36.  Based on the assurances of Ms. Lockwood, Mr. Droz, and other employees and representatives of the State of Michigan assuring SFP LLC that it would receive the tax credit, and their oral and implied contracts with SFP LLC committing to that promise, SFP LLC made the required contracts and agreements with various Michigan production staff, as was required by the impending window of dates in which to shoot the production.

37.  When the date for filming quickly approached, however, SFP LLC still

Had not received the written approval it was promised was certain.  By that time, and based on the assurances and implied contracts made by MI Film and State of Michigan representatives, it was too late to pull out of the production commitments SFP LLC made to various Michigan businesses.

38.  After repeated phone calls and e-mails to Ms. Lockwood, Mr. Droz, and others at the Michigan Film Office, Ms. Lockwood arbitrarily and capriciously denied SFP LLC's application without any explanation and despite oral and implied contract with SFP LLC promising otherwise.

39.  Because Sandy Frank and SFP LLC relied on the oral contracts with Lockwood, Droz, MI Film, and other State of Michigan entities and representatives, SFP had no choice but to go ahead with the production, at a cost of over $350,000.  Unlike the State of Michigan, Sandy Frank and his company, SFP LLC, abides by his word and keeps his commitment to contracts, implied, oral, and otherwise.

40. Sandy Frank and SFP LLC planned to make ongoing, regular television productions in the State of Michigan with "The Making of . . . ," had the Michigan Film Tax Credit been approved as SFP LLC had been promised it would be.
In the course of filming "The Making of . . ."/"Face the Music," SFP LLC employed and paid 176 Michigan residents and would likely have employed as many Michigan residents with the filming of each "The Making of . . ." show, had the Michigan Film Tax Credit been approved as SFP LLC had been promised it would be.

41. In the course of filming "The Making of . . ."/"Face the Music," SFP LLC did business with and paid eight (8) Michigan businesses, resulting in paid work for additional Michigan residents above and beyond the 176 who were paid and

employed by SFP LLC.  Those companies, Weird Cam, Chow Catering, Grace and Wild Studios, The Hilton Garden Inn Hotel, Gateway Travel, Casting Motor City, George B. Ford Agency, Inc., and Fine Prompting, would have had continuing paid business from SFP LLC, had the Michigan Film Tax Credit for "The Making of . . ." been approved as SFP LLC had been promised it would be.

42.  The final product, a pilot of "The Making of . . .," shows Michigan and its residents in a very positive, favorable light.  The Michigan businesses and residents are shown in such a way that it is a de facto commercial for the State of Michigan.  Positive and beneficial portrayals of the State of Michigan are part of the criteria which are supposed to be utilized in the decision process regarding granting the Michigan Film Tax credit.

43.  It appears, however, that, in fact, the required criteria were not used in Michigan Film Tax Credit application process.

44.  On September 18, 2009, SFP LLC controller Rosalie Perrone submitted the Film Production Incentive Agreement (hereinafter referred to as, the "application") after spending much time with Janet Lockwood and other officials of MI Film in filling it out and putting in the answers they suggested.

45.  On September 30, 2009, Lockwood quickly rejected the application, from her location abroad in London, after barely a look at the application she helped SFP LLC fill out.  Lockwood knew this was just a day before the October 1, 2009 filming of "The Making of . . ."/"Face the Music" was set to film in Michigan, due to Lockwood's personal inducement and promises to SFP LLC, persuading the company to make it in Michigan, instead of in Connecticut or another state.

46.  Lockwood gave no reason for turning down the application she promised to approve.

47.  Thereafter, pursuant to repeated letters and phone conversations with State of Michigan officials, including Daniel Krichbaum, SFP LLC's Application was apparently reconsidered, but repeatedly State of Michigan officials turned down SFP LLC's Application, with a final denial on or about late March 2010, although ongoing discussions proceeded between SFP LLC and State of Michigan officials in an attempt to resolve the matter.

48.  One of the reasons eventually provided for denial provided by then-Governor Jennifer Granholm's advisor, Krichbaum, was that "The Making Of . . ." is allegedly a game show, prohibited by the MCL 208.1455.  However, as was made clear to Krichbaum and all of the other MI Film and State of Michigan officials and employees involved, it is a reality show.  This is made clear in the final product, the pilot.  In repeated conversations and discussions with Lockwood, she acknowledged that "The Making Of . . ." is a reality show.

49.  Krichbaum's experience in the arena of film and/or television production is non-existent.  His experience is largely as a liberal Christian religious figure who delivered kumbaya sermons for a multi-cultural group, the Diversity Roundtable (previously called the "National Conference for Community and Justice"), which seeks to equate extremist Muslims in the Detroit area with moderate Jews and Christians.  Not long before his appointment to the Granholm staff, he appeared making an apologist speech at a Muslim Ramadan Iftar dinner, sponsored by Life for Relief and Development, a Muslim charity raided by the FBI for allegedly for fundraising for HAMAS and Al-

Qaeda.  Prior to his appointment to the Granholm staff, Krichbaum's most active involvement in the area of film and/or television production was his vocal denunciation (in a major Detroit newspaper) of "Sleeper Cell," a fictional Showtime series, written by a prominent Muslim Hollywood figure, about an Islamic terrorist cell in the United States.  Currently, Krichbaum is the Executive Director of the Michigan Civil Rights Commission, appointed by Governor Richard Snyder to continue the last position for which Governor Jennifer Granholm appointed him in her gubernatorial administration. In addition to his lack of experience in the entertainment and film production industry, it is clear that Krichbaum has a specific political agenda through which all decisions are made, contrary to the intent and express requirements of the Michigan Film Tax Credit statute, the Michigan Business Tax Act, MCL 208.1455.  Apparently SFP LLC and "The Making Of . . ." / "Face the Music" did not have a place in that agenda.

50.  SFP LLC provided Lockwood and other MI Film and State of Michigan Employees with a long list of "Additional Diverse Events That Would Be Part of Our Series Movie Forward."  The list included at least 27 diverse events in the State of Michigan, at which "The Making Of …" would provide a reality show behind the scenes look.  None of these involved a game show.  The initial pilot provided a behind the scenes look at a game show, "Face the Music," to give an example of the type of entertaining, insider behind the scenes look "The Making Of …" would provide.

51.  MI Film approved the Michigan Film Tax Credit for at least two game shows, involved in the reality genre, including "Crash Course," which, upon information and belief, received nearly $2.7 million in Michigan Film Tax Credit funds.  In violation of various Michigan laws requiring public disclosure of the funds rebated for the Michigan

Film Tax Credit, MI Film does not list the amount of funds rebated to the producers of

"Crash Course." However, upon information and belief, and based on the fact that MI

Film listed alphabetically the shows it approved for tax credits, it appears that MI Film

approved $2.7 million in rebates to the makers of "Crash Course," which is apparently

listed as "Confidentiality Requested," between the data for "Clark Family Christmas" and

"Daisy Tells a Secret," on "Michigan Film Office 2009 Annual Report Exhibit A."

Pursuant to its receipt of Michigan Film Tax Credit rebates, "Crash Course" was able to

get 42% off of the cars it crashed on Detroit's Belle Isle.

52.  The Internet Movie Database, also known as IMDB.com, describes "Crash

Course" as a game show, clearly proscribed by the Michigan Business Tax Act, MCL

208.1455:

> "Crash Course" pairs up relatives, friends and other related twosomes and
> not only puts their navigating skills to the test, but test drives their
> relationships and patience, making the teams work together and summon
> their greatest driving skills to make it across the finish line. Each week,
> five teams of two will competed and be eliminated one by one before
> facing the final "Crash Course" for a chance to win $50,000.

http://www.imdb.com/title/tt1490108/

53.  Michigan Business Tax Action, MCL 208.1455 (12)(k) states:

Qualified production does not include any of the following: . . . (x) A game show.  Said

section should preclude the granting of the Michigan Film Tax Credit to the makers of

"Crash Course," but should not preclude the granting of the Michigan Film Tax Credit to

the producers of "The Making Of . . . ."  Yet, MI Film and State of Michigan unfairly and

in violation of Michigan Business Tax Act, MCL 208.1455 chose to award the

unqualified production/game show a Michigan Film Tax Credit and not the qualified

production reality show, "The Making Of . . . ."

54.  MI Film also approved Michigan Film Tax Credit rebate funds for "Wedding Day," which is also apparently a game show/reality show, as applicants to the show compete to receive the designation of "deserving bride" to win an on-air Wedding Day of their dreams.  The series is produced by Mark Burnett, who is well-known for his production of game shows in the reality genre.

55.  Because MI Film approved Michigan Film Tax Credit funds for at least two reality game shows and refused to approve the Film Tax Credit for "The Making of . . . ," which is not, in fact, a game show, Plaintiff can only conclude that MI Film and State of Michigan officials' stated claim that "The Making of . . ." did not qualify for the Film Tax Credit because it is a "game show"—and is allegedly, therefore, not a "qualified production"—is false, pre-textual, and arbitrarily and capriciously applied.

56.  Also among the reasons finally provided to SFP LLC for the denial of the Michigan Film Tax Credit was the claim that "The Making Of …" was that MI Film decided that "it was unlikely that future episodes of the series would be filmed in Michigan, even if the pilot were, in fact, picked up by a network."

57.  In fact, SFP LLC submitted to MI Film and other State of Michigan officials four (4) pages of at least twenty-seven (27) "The Making Of . . ." shows to be shot in Michigan, all showcasing events occurring in Michigan.  As stated in Sandy Frank's many letters to MI Film and State of Michigan officials, it was SFP LLC's plan to shoot the entire series in Michigan, exclusively, predicated on approval of the Michigan Film Tax Credit.  Further, SFP LLC had begun shopping around the pilot episode shot in Michigan to various cable networks which had expressed interest, and SFP LLC planned to produce the program in Michigan, predicated upon the Michigan Film Tax Credit.

58.  In addition to the other false contentions made by MI Film and the State of Michigan, *supra*, in arbitrarily and capriciously denying SFP LLC the Michigan Film Tax Credit for "The Making Of . . .," State of Michigan officials claimed that the production of the pilot "would not have a significant economic impact."  Letter of Nathaniel Lake, Cabinet Secretary for Governor Jennifer Granholm, November 12, 2009.  However, as stated, *supra*, SFP LLC spent over Three-Hundred-And-Fifty-Thousand Dollars ($350,000.00) in Michigan for "The Making Of . . ." pilot.  Further, as also stated, *supra*, in the course of filming "The Making of . . ."/"Face the Music," SFP LLC paid and employed 176 Michigan residents and did business with and paid eight (8) Michigan businesses, resulting in paid work for additional Michigan residents above and beyond the 176 who were paid and employed by SFP LLC.

59.  "The Making Of . . ." is a positive portrayal of Michigan residents, businesses, locations, and locales.  It involves no sex, indecency, violence, gore, or other such characteristics that would reflect negatively on the State of Michigan.  It reflects well on the State of Michigan and would have been a good investment in the positive public relations and generation of jobs the Michigan Film Tax Credit was designed to create.

60.  However, it appears MI Film did not take this—the promotion of the State of Michigan in a positive light—into consideration, which was the original intent of the drafters of the Michigan Film Tax Credit legislation, and a stated factor required to be taken into account in the language of the actual Michigan statute.  Instead, MI Film awarded the Michigan Film Tax Credit to the following productions, which negatively portray the State of Michigan, and include the portrayals of Michigan residents as people

who resort to becoming male prostitutes in order to make ends meet, suicide doctors,

sadists, aging porn stars, criminals, and other sorts of ne'er-do-wells, geeks, losers,

people with no hope, and law-breakers:

      a.   "Hung":  This is an HBO show depicting a down-and-out Detroit area,

              broke gym teacher, who discovers he has a large penis and becomes a

              male prostitute.  The show is filled with obscenities, despite the fact

              that the Michigan Film Tax Credit prohibits that in a "qualified

              production."  Michigan Business Tax Act, MCL 208.1455(3)(d).  The

              posters and advertisements for this show read, "Middle-Aged.

              Divorced.  Broke.  Gigolo.  It's Hard to Make an Indecent Living."

              The Supervisor of West Bloomfield Township, where the show is shot,

              told a Detroit newspaper that producers made a "concerted effort" to

              work with township and school officials on the nude scene in the

              opening credits so it wasn't filmed when kids would be around.  "HBO

              Male Escort Comedy Films in West Bloomfield Twp," The Detroit

              News, June 15, 2009.  Upon information and belief, "Hung's"

              producers received approximately $1,412,405.00 in Michigan Film

              Tax Credit rebates for 2008, and $1,443,325.00 in Michigan Film Tax

              Credit rebates for 2009.  Again, in violation of various Michigan laws

              requiring public disclosure of the funds rebated for the Michigan Film

              Tax Credit, MI Film does not list the amount of funds rebated to the

              producers of "Hung" for 2009.  However, upon information and belief,

              and based on the fact that MI Film listed alphabetically the shows it

approved for tax credits, it appears that MI Film approved

$1,443,325.00 in rebates to the makers of "Hung," which is apparently

listed as "Confidentiality Requested," ," between the data for

"Highland Park" and "Hunting Blind," on "Michigan Film Office 2009

Annual Report Exhibit A "Hostel:  Part III" is conspicuously missing

from MI Film's reports, but the filmmakers of this production told

several Detroit media outlets that they were approved for the Michigan

Film Tax Credit and otherwise would not have shot in Michigan.  The

first two installments of the "Hostel" horror movie franchise contain

extremely graphic violence, dismemberment, murder, and torture.

And the third installment is expected to follow suit.  Because MI Film

declined to list "Hostel:  Part III" in any of its annual reports, it is

unknown how much money the makers of this movie received in

rebates from the State of Michigan.

b.   "Miss January," also known as "Meet Monica Velour," which centers

on an aging pornography star and one of her young fans.  The Tribeca

Film Festival's website summarizes the movie's plot:

> For Tobe, a nerdy, horny, frizzy-haired cineaste who
> doesn't quite fit in with the average contemporary teen, the
> pinnacle of womanhood is Monica Velour (Kim Cattrall), a
> soft-core actress who reached the zenith of her career in the
> 1980s. When Tobe learns that his love idol is headlining
> hundreds of miles away at the Gentlemen's Petting Zoo in
> Indiana, he drives off with carefree glory—in his
> grandfather's (Brian Dennehy) used Weinermobile, no
> less—filled with the hope of meeting her. When Tobe
> defends Monica's honor against ruffians who taunt the
> aging erotic starlet off the stage, he lands a pity invite into
> Monica's trailer. As the two begin an unlikely friendship,

> Tobe's unripe romantic impulses entangle with her messy life as a struggling single mother embroiled in a custody battle for her only daughter.

http://www.tribecafilm.com/filmguide/meet_monica_velour-film30833.html

The movie's production company received approximately $1,700,208.00 from the State of Michigan in Film Tax Credit rebates.

(c)   "Kevorkian," also known as, "You Don't Know Jack":  This HBO movie promotes Michigan as the home of suicide doctor Jack Kevorkian a/k/a "Dr. Death," who helped people commit suicide by administering fatal drugs.  Producers of this film received a Michigan film tax credit of approximately $81,385.00 for glorifying doctor-assisted suicide and one of Michigan's most famous convicted criminals.

(d)   "Virgin on Bourbon Street" a/k/a "American Virgin":  This sleazy movie, stars Rob Schneider, well known for his starring roles in "Deuce Bigalow: Male Gigolo," and "Deuce Bigalow:  European Gigolo."  The movie's "plot" is described on the Internet Movie Database a/k/a IMDB.com:

> A Freshman College Girl on a scholarship from an abstinence group that advocates saving sex until marriage discovers that her antics on a night of debauchery, when she reluctantly got drunk for the first time in her life, were captured on camera by a sleazy video producer. Now she and her friends must travel across country to recover the incriminating footage.

http://www.imdb.com/title/tt1318044/.  The producers of this movie received approximately $1,534,473.00 in Michigan Film Tax Credit rebates.

(e) "A Very Harold & Kumar Christmas":  Although this movie was not listed in any of the reports produced by MI Film, upon information and belief, the film qualified for the Michigan Film Tax Credit, the alleged reason it was shot almost in its entirety in Michigan.  The two previous installments of the "Harold & Kumar" movie franchise, include the lewd, dirty, and disgusting exploits of two 20-something men who are known for their marijuana-smoking.

(f) "Mooz-lum":  This movie, which actively promotes the religion of Islam, received approximately $617,400.00 in Michigan Film Tax Credit rebates, according to the Michigan Film Office 2009 Annual Report.  Incredibly, one of the paid actors in the movie—whose salary was subsidized by the Michigan Film Tax Credit—is Imam Siraj Wahhaj, whom the U.S. Justice Department named as an unindicted co-conspirator in the 1993 Al-Qaeda bombing of the World Trade Center.   Wahhaj defended the 1993 World Trade Center bombers, saying that the "real terrorists" are the FBI and CIA.  He openly supports Islamic terrorist groups, including HAMAS and Hezbollah, the organization that murdered over 300 U.S. Marines and civilians in its attacks on the U.S. Marine barracks and U.S. Embassy in Beirut.  His acting role in "Mooz-lim" was that of a "peaceful" Muslim cleric.  Moreover, Defendants' granting of the Michigan Tax Credit to the "Mooz-lum" production apparently violates not only the Establishment Clause of the First Amendment to the United States Constitution, but similar, much stricter parallel provisions

in the Michigan Constitution and Michigan statutes.  No other production
that so blatantly promotes religion was approved for a Michigan Film Tax
Credit.  Article I, Section 4 of the Michigan Constitution states:

> No person shall be compelled to attend, or, against
> his consent, to contribute to the erection or support
> of any place of religious worship, or to pay tithes,
> taxes or other rates for the support of any minister
> of the gospel or teacher of religion. No money shall
> be appropriated or drawn from the treasury for the
> benefit of any religious sect or society, theological
> or religious seminary; nor shall property belonging
> to the state be appropriated for any such purpose.

The granting of Michigan Film Tax Credits and/or the transfer of
Michigan Treasury funds of any kind to the production of "Mooz-lum" are
a clear violation of Article I, Section 4 of the Michigan Constitution.
Moreover, "Mooz-lum" presents a false, very negative image of Michigan
residents and institutions as bigoted, violent, and blood-thirsty.  It portrays
University of Michigan students and deans as anti-Muslim extremists,
showing students gathering in a mob that beats up Muslims after the 9/11
attacks and portraying a Michigan Dean sending out anti-Muslim campus-
wide e-mails to students.  In real life, none of this ever happened.  On the
contrary, post-9/11, Muslim attacks on Jewish students at the University of
Michigan are up.  In one of several such incidents, Daniel Aghion, a
University of Michigan Student walking on the school's campus while he
was wearing a yarmulke, was chased in an automobile by Muslims who
threw glass bottles at him.  The perpetrators were apprehended and
prosecuted.

    (g)  "Stone":  This movie, set in Michigan, is extremely violent and depicts Michiganders as far-right religious zealots and hypocrites who sleep with the girlfriends of criminals.  It is hard to understand how this movie has anything but negative promotional value for the State of Michigan and its tourism industry.  Moreover, it is a not-so-veiled attack on the religious Christians and social conservatives of the State of Michigan.  The makers of this movie received approximately $5,007,197.00 in Michigan Film Tax Credit rebates.

    (h)  "Up In the Air":  This movie depicts corporate down-sizing and the cold, calculated firing of employees.  The portions that were shot in Detroit, depict actor George Clooney traversing snow, slushy, gloomy weather to fire employees.  He cruelly fires a man in his fifties, who responds by crying and wondering who in Detroit will ever hire him for another job at that age.  There are also shots of Clooney in Detroit Metropolitan Airport flying to and from firing people from their jobs.  It is not apparent what positive tourism and/or public relations value for Michigan achieved from this movie.  However, it cost the State of Michigan approximately $391,043.00 in film tax credit rebates to "Up In the Air" producers.

61.  As stated, *supra*, SFP LLC received a final denial of the Michigan Film Tax Credit in a letter from Daniel Krichbaum, dated in late March 2010.  However, Krichbaum and other State of Michigan officials repeatedly reconsidered and repeatedly denied SFP LLC's application and request for its deserved Michigan Film Tax Credit rebate on the same or similar grounds.

62.  SFP LLC has exhausted all available administrative remedies.

**FIRST CLAIM FOR RELIEF**
**Violation of MCL 208.1455,**
**Michigan Film Production Tax Credit**

63.  Plaintiff re-alleges and incorporates by reference all prior paragraphs in this Complaint as though repeated herein.

64. Nothing in the statutory definition or the entirety of the Michigan Film Production Tax Credit, codified as Michigan Business Tax Act, MCL 208.1455, mandates, suggests, or otherwise permits Defendants to change the definition of an eligible production company or define that a qualified production "cannot include a 'making of' style reality show."  Thus, Defendants' newly created "requirement" that "The Making Of . . ." not include a behind the scenes look at a game show has no basis in law, if—as is the case here—the production is a reality show and not an actual game show.

65. Defendants' newly created "requirement" that a "qualified production" must not include a game show in its "behind the scenes" reality show  is without basis in law and is directly at odds with the specific text of the Michigan Film Production Tax Credit, Michigan Business Tax Act, MCL 208.1455(12)(k), which only excludes the production of "a game show," Michigan Business Tax Act, MCL 208.1455(12)(k)(x), but does not exclude the production of a reality show, one or more of the episodes of which is limited to a "behind-the-scenes" look at how such an enterprise is created.  Michigan Business Tax Act, MCL 208.1455(12)(k).

66. The Michigan Film Tax Credit, Michigan Business Tax Act, MCL

208.1455(4) specifically requires that MI Film consider certain factors in deciding

whether or not to approve a Michigan Film Tax Credit application:

> (4)  In determining whether to enter into an agreement under this section, the Michigan film office and the state treasurer shall consider all of the following:
>
> (a)  The potential that in the absence of the credit the qualified production will be produced in a location other than this state.
>
> (b)  The extent to which the qualified production may have the effect of promoting this state as a tourist destination.
>
> (c)  The extent to which the qualified production may have the effect of promoting economic development.
>
> (d)  The extent to which the credit will attract private investment for the production of qualified productions in this state.
>
> (e)  The record of the eligible production company in completing commitments to engage in a qualified production.

Michigan Business Tax Act, MCL 208.1455(4)

67. As stated, *supra*, SFP LLC officials and staff repeatedly informed MI Film

and other State of Michigan officials, including Janet Lockwood and Ken Droz, that "The

Making Of . . ." / "Face the Music" was already approved by the State of Connecticut for

a thirty percent (30%) tax credit.

68. MI Film and other State of Michigan officials knew that SFP LLC planned to

accept the State of Connecticut's offer of a thirty percent (30%) rebate and was going to

proceed to produce "The Making Of . . ." / "Face the Music" in Connecticut.

69.  As stated, *supra*, MI Film and other State of Michigan officials discouraged

SFP LLC officials from accepting the State of Connecticut film tax credit offer of a thirty

percent (30%) rebate, promising SFP LLC the higher forty-two percent (42%) that the

State of Michigan provides to eligible production companies and their qualified productions.

70. Therefore, SFP LLC and its "The Making Of . . ." / "Face the Music" clearly and specifically met and satisfied the requirement set forth in Michigan Business Tax Act, MCL 208.1455(4)(a), as it demonstrated "that in the absence of the credit the qualified production will be produced in a location other than this state."  Michigan Business Tax Act, MCL 208.1455(4)(a).

71.  As stated, *supra*, SFP LLC ultimately gave up the thirty percent (30%) incentive already approved by the State of Connecticut, based on the promises and assurances of MI Film and other State of Michigan officials.

72.  However, it appears that MI Film and other State of Michigan officials ultimately ignored and contravened the express language of Michigan Business Tax Act, MCL 208.1455(4)(a) in denying the Michigan Film Tax Credit to SFP LLC.

73.  As stated, *supra*, SFP LLC's "The Making Of . . ." / "Face the Music" presents an extremely positive and glowing portrait of the State of Michigan, its companies, its people, and its locations.  It was, therefore, certain to "have the effect of promoting this state as a tourist destination," pursuant to Michigan Business Tax Act, MCL 208.1455(4)(b)

74.  As stated, *supra*, Sandy Frank, the sole member of SFP LLC, is the most successful independent syndicator of television programming and his programming has been seen and distributed in over one hundred (100) countries throughout the world.  Therefore, it was very likely that "The Making Of …" would have been purchased for distribution and seen worldwide.  It was therefore, certain to "have the effect of

promoting this state as a tourist destination," pursuant to Michigan Business Tax Act, MCL 208.1455(4)(b)

75.  MI Film and other applicable State of Michigan employees were well aware of "The Making Of . . .'s" positive promotional value to tourism in the State of Michigan.

76.  However, it appears that MI Film and other State of Michigan officials ultimately ignored and contravened the express language of Michigan Business Tax Act, MCL 208.1455(4)(b) in denying the Michigan Film Tax Credit to SFP LLC.

77.  As stated, *supra*, SFP LLC's "The Making Of . . ." / "Face the Music" presents an extremely positive and glowing portrait of the State of Michigan, its companies, its people, and its locations.  It was, therefore, certain to "have the effect of promoting economic development in this state," pursuant to Michigan Business Tax Act, MCL 208.1455(4)(c)

78.  As stated, *supra*, Sandy Frank, the sole member of SFP LLC, is the most successful independent syndicator of television programming and his programming has been seen and distributed in over one hundred (100) countries throughout the world. Therefore, it was very likely that "The Making Of …" would have been purchased for distribution and seen worldwide.  It was therefore, certain to "have the effect of promoting economic development in this state," pursuant to Michigan Business Tax Act, MCL 208.1455(4)(c).

79. MI Film and other applicable State of Michigan employees were well aware of "The Making Of . . .'s" positive promotional value to economic development in the State of Michigan.

80. However, it appears that MI Film and other State of Michigan officials ultimately ignored and contravened the express language of Michigan Business Tax Act, MCL 208.1455(4)(c) in denying the Michigan Film Tax Credit to SFP LLC.

81. As stated, *supra*, SFP LLC's "The Making Of . . ." / "Face the Music" presents an extremely positive and glowing portrait of the State of Michigan, its companies, its people, and its locations. It was, therefore, certain to "attract private investment for the production of qualified productions in this state," pursuant to Michigan Business Tax Act, MCL 208.1455(4)(d).

82. As stated, *supra*, Sandy Frank, the sole member of SFP LLC, is the most successful independent syndicator of television programming and his programming has been seen and distributed in over one hundred (100) countries throughout the world. Therefore, it was very likely that "The Making Of …" would have been purchased for distribution and seen worldwide. It was therefore, certain to "attract private investment for the production of qualified productions in this state," pursuant to Michigan Business Tax Act, MCL 208.1455(4)(d).

83. Sandy Frank, the sole member of SFP LLC, is well known throughout the entertainment and production industry. His positive experience in producing a qualified production in the State of Michigan was imperative to "attract private investment for the production of qualified productions in this state," pursuant to Michigan Business Tax Act, MCL 208.1455(4)(d).

84. MI Film and other applicable State of Michigan employees were well aware of "The Making Of . . .'s" positive promotional value in attracting private investment for the production of qualified productions in the State of Michigan and Sandy Frank's value

in attracting private investment for the production of qualified productions in the State of Michigan.

85.  However, it appears that MI Film and other State of Michigan officials ultimately ignored and contravened the express language of Michigan Business Tax Act, MCL 208.1455(4)(d) in denying the Michigan Film Tax Credit to SFP LLC.

86.  Their poor and deceitful treatment of SFP LLC and is sole member, Sandy Frank, negatively affected the attraction of "private investment for the production of qualified productions in this state," pursuant to Michigan Business Tax Act, MCL 208.1455(4)(d).

87.  As stated, *supra*, Sandy Frank, the sole member of SFP LLC, is the most successful independent syndicator of television programming and his programming has been seen and distributed in over one hundred (100) countries throughout the world.  He has a history of more than five successful decades in television and other entertainment industry production and distribution.  He and the Sandy Frank entities have a "record . . . of completing commitments to engage in a qualified production," pursuant to Michigan Business Tax Act, MCL 208.1455(4)(e).

88.  Sandy Frank, the sole member of SFP LLC, is well known throughout the entertainment and production industry.  He is well known to have a "record . . . of completing commitments to engage in a qualified production," pursuant to Michigan Business Tax Act, MCL 208.1455(4)(e).

89.  MI Film and other applicable State of Michigan employees were well aware of Sandy Frank and the Sandy Frank Entities and their "record . . . of completing

commitments to engage in a qualified production," pursuant to Michigan Business Tax

Act, MCL 208.1455(4)(e).

90.  However, it appears that MI Film and other State of Michigan officials

ultimately ignored and contravened the express language of Michigan Business Tax Act,

MCL 208.1455(4)(e) in denying the Michigan Film Tax Credit to SFP LLC.

91.  Clearly, SFP LLC, "The Making Of . . .," SFP LLC's member, Sandy Frank,

and the Sandy Frank Entities met each of the factors MI Film and State of Michigan

officials were required to take into account in award Michigan Film Tax Credits, pursuant

to Michigan Business Tax Act, MCL 208.1455(4)(a) through (e).

92.  It is apparent that MI Film and State of Michigan officials ignored the

specific language of Michigan Business Tax Act, MCL 208.1455(4)(a) through (e).

93.  A close examination of the projects which did, in fact, receive Michigan Film

Tax Credit approval from MI Film, including the projects described, *supra*, (as well as

the others), shows that most such projects receiving approval and ultimately receiving

Michigan Film Tax Credits did not meet any or most of the factors set forth in Michigan

Business Tax Act, MCL 208.1455(4)(a) through (e), whereas SFP LLC met and

surpassed each of these factors.

94.  As a result of Defendants' wrongful interpretation and improper application

of the Michigan Film Production Tax Credit, SFP LLC was improperly denied as an

applicant for the Michigan Film Production Tax Credit for "The Making Of . . . ."

95.  As a direct and proximate result of Defendants' violations of the Michigan

Business Tax Act, MCL 208.1455, Plaintiff has suffered irreparable harm entitling it to

declaratory and injunctive relief and damages as set forth in the common allegations of this Complaint.

WHEREFORE, by virtue of the foregoing, there exists an actual and justiciable controversy between SFP LLC and Defendants, and this Honorable Court should enter a declaratory judgment in favor of SFP LLC and against Defendants, as requested by SFP LLC in this Complaint.

## SECOND CLAIM FOR RELIEF
### Violation of Michigan Administrative Procedures Act, MCL 24.201 Et Seq.

96.  Plaintiff re-alleges and incorporates by reference all prior paragraphs in this Complaint as though repeated herein.

97.  Defendants exceeded their statutory authority and duty to administer the Michigan Film Production Tax Credit under the Michigan Business Tax Act, MCL 208.1455, by attempting to define "qualified production" in a manner different from the Michigan Legislature's express definition and by administering a definition of "qualified production" that is not authorized under the law.

98.  Defendants' decision resulted from improper rulemaking and arbitrary and capricious decision-making in violation of Michigan's Administrative Procedures Act, MCL 24.201 et seq., as Defendants imposed additional requirements on applicants and incorrectly define terms within the statute without properly promulgating such as rules.

99.  Defendants' decision is not supported by any reasonable, competent, material, or substantial evidence, and reflects a general lack of understanding of the types of productions and programming authorized to apply for the Michigan Film Production

Tax Credit, which Defendants administer.  Thus, application of Defendants' arbitrary requirements and arbitrary and capricious application of the statute's requirements would render a significant number of qualified film and television applicants ineligible for the tax credit and has, on the flip side, rendered a significant number of unqualified film and television applicants eligible for the tax credit, which clearly undermines the intent and the express language of the Legislature in enacting the Michigan Film Production Tax Credit.

100.  As a direct and proximate result of Defendants' violations of Michigan's Administrative Procedures Act, MCL 24.*201et seq.*, in applying Michigan Business Tax Act, MCL 208.1455, Plaintiff has suffered irreparable harm entitling it to declaratory and injunctive relief and damages as set forth in the common allegations of this Complaint.

WHEREFORE, by virtue of the foregoing, there exists an actual and justiciable controversy between SFP LLC and Defendants, and this Honorable Court should enter a declaratory judgment in favor of SFP LLC and against Defendants, as requested by SFP LLC in this Complaint.

## THIRD CLAIM FOR RELIEF
### Unjust Enrichment

101. Plaintiff re-alleges and incorporates by reference all prior paragraphs in this Complaint as though repeated herein.

102.  Plaintiff spent over $350,000.00 entirely in the State of Michigan for the production of "The Making Of . . ." based on the inducements, promises, and assurances of MI Film and other State of Michigan officials, including Janet Lockwood and Ken Droz.

103.  Defendants financially and otherwise profited from the labor, goods, and services which Plaintiff procured and paid for within the State of Michigan for said production.

104.  Defendants were aware that Plaintiff was spending and did spend said monies described above and accepted the economic benefits of said expenditures by Plaintiff.

105. Unless Plaintiff is granted judgment in its favor against Defendants, Defendants will be unjustly enriched at the expense of Plaintiff, which would constitute a manifest injustice.

106.  As a direct and proximate result of Defendants' actions in improperly applying and administering the Michigan Business Tax Act, MCL 208.1455 and in improperly inducing and promising Plaintiff it would receive the Michigan Film Tax Credit, Defendants have been unjustly enriched at Plaintiff's expense, and Plaintiff has suffered irreparable harm entitling it to declaratory and injunctive relief and damages as set forth in the common allegations of this Complaint.

WHEREFORE, by virtue of the foregoing, there exists an actual and justiciable controversy between SFP LLC and Defendants, and this Honorable Court should enter a declaratory judgment in favor of SFP LLC and against Defendants, as requested by SFP LLC in this Complaint.

## FOURTH CLAIM FOR RELIEF
### Breach of Contract

107.  Plaintiff re-alleges and incorporates by reference all prior paragraphs in this Complaint as though repeated herein.

108. Defendants induced SFP LLC to forgo a guaranteed, approved State of Connecticut film tax credit for "The Making Of . . ." and induced SFP LLC to expend at least $350,000.00 in exchange for the guarantee of a Michigan Film Tax Credit rebate of forty-two percent (42%) of all funds expended in the State of Michigan, in accordance with said agreement.

109. Defendants and their employees and representatives urged and induced SFP LLC to make irreversible financial commitments to expenditures for the production and filming of "The Making Of …" in exchange for their promises and commitment to approve SFP LLC and "The Making Of . . ." for the Michigan Film Tax Credit rebate of forty-two percent (42%).

110. All elements of a contract existed, as there was a meeting of the minds and express agreement between the parties, mutual consideration, and substantial performance by SFP LLC.

111. Defendants violated and materially breached said contract by refusing to perform as promised in approving SFP LLC and "The Making Of . . ." for the Michigan Film Tax Credit, pursuant to the Michigan Business Tax Act, MCL 208.1455.

112. As a direct and proximate result of Defendants' breach of contract, Defendants have been unjustly enriched at Plaintiff's expense, and Plaintiff has suffered irreparable harm entitling it to declaratory and injunctive relief and damages as set forth in the common allegations of this Complaint.

WHEREFORE, by virtue of the foregoing, there exists an actual and justiciable controversy between SFP LLC and Defendants, and this Honorable Court should enter a

declaratory judgment in favor of SFP LLC and against Defendants, as requested by SFP LLC in this Complaint.

## FIFTH CLAIM FOR RELIEF
### Breach of Implied Contract

113.  Plaintiff re-alleges and incorporates by reference all prior paragraphs in this Complaint as though repeated herein.

114.  In the event that this Honorable Court finds that an actual contract did not exist, an implied contract certainly existed and was breached by Defendants, as Defendants induced Plaintiff to forgo a rebate elsewhere and expend at least $350,000.00 on production and filming within the State of Michigan, knowing Plaintiff relied on the promises and implied contract of Defendants.

115. Defendants induced SFP LLC to forgo a guaranteed, approved State of Connecticut film tax credit for "The Making Of . . ." and induced SFP LLC to expend at least $350,000.00 in exchange for the guarantee of a Michigan Film Tax Credit rebate of forty-two percent (42%) of all funds expended in the State of Michigan, in accordance with said agreement.

116. Defendants and their employees and representatives urged and induced SFP LLC to make irreversible financial commitments to expenditures for the production and filming of "The Making Of …" in exchange for their promises and commitment to approve SFP LLC and "The Making Of . . ." for the Michigan Film Tax Credit rebate of forty-two percent (42%).

117. All elements of an implied contract existed, as Defendants made express

promises and commitments to knowingly induce Plaintiff to spend hundreds of thousands of dollars in Michigan and forgo a rebate from another state.  Defendants knew that Plaintiff relied upon the promises of Defendants and believed a contract existed.  They also knew that Plaintiff substantially performed its obligations pursuant to said implied contract.  Defendants knowingly induced and accepted the performance of an implied contract and accepted benefits of said performance of implied contract.

118.  Defendants violated and materially breached said implied contract by refusing to perform as promised in approving SFP LLC and "The Making Of . . ." for the Michigan Film Tax Credit, pursuant to the Michigan Business Tax Act, MCL 208.1455.

119.  As a direct and proximate result of Defendants' breach of implied contract, Defendants have been unjustly enriched at Plaintiff's expense, and Plaintiff has suffered irreparable harm entitling it to declaratory and injunctive relief and damages as set forth in the common allegations of this Complaint.

WHEREFORE, by virtue of the foregoing, there exists an actual and justiciable controversy between SFP LLC and Defendants, and this Honorable Court should enter a declaratory judgment in favor of SFP LLC and against Defendants, as requested by SFP LLC in this Complaint.

### SIXTH CLAIM FOR RELIEF
### Fraud / Misrepresentation

120.  Plaintiff re-alleges and incorporates by reference all prior paragraphs in this Complaint as though repeated herein.

121.  Defendants and their employees, officials, agents, and representatives,

repeatedly and deliberately made promises and guarantees to Plaintiff, and induced Plaintiff to forgo a rebate elsewhere and expend at least $350,000.00 on production and filming within the State of Michigan.

122.  It is now apparent that Defendants never intended to keep such promises and that said guarantees were fraudulent and made knowing that Plaintiff would rely on said fraud and misrepresentation in foregoing a rebate elsewhere and expending at least $350,000 on production and filming within the State of Michigan.

123.  Defendants induced SFP LLC to forgo a guaranteed, approved State of Connecticut film tax credit for "The Making Of . . ." and induced SFP LLC to expend at least $350,000.00 in exchange for the guarantee of a Michigan Film Tax Credit rebate of forty-two percent (42%) of all funds expended in the State of Michigan, all as a result of Defendants' fraud and misrepresentation.

124.  Defendants and their employees and representatives urged and induced SFP LLC to make irreversible financial commitments to expenditures for the production and filming of "The Making Of …" in exchange for their fraudulent promises and false commitment to approve SFP LLC and "The Making Of . . ." for the Michigan Film Tax Credit rebate of forty-two percent (42%).

125.  Defendants knowingly induced and accepted the benefits of Plaintiff's reliance on Defendants' fraud and misrepresentation.

126.  As a direct and proximate result of Defendants' fraud and misrepresentation, Defendants have been unjustly enriched at Plaintiff's expense, and Plaintiff has suffered irreparable harm entitling it to declaratory and injunctive relief and damages as set forth in the common allegations of this Complaint.

WHEREFORE, by virtue of the foregoing, there exists an actual and justiciable controversy between SFP LLC and Defendants, and this Honorable Court should enter a declaratory judgment in favor of SFP LLC and against Defendants, as requested by SFP LLC in this Complaint.

### SEVENTH CLAIM FOR RELIEF
### Equal Protection – 14th Amendment
### Different Treatment of Similarly Situated Parties

127.  Plaintiff re-alleges and incorporates by reference all prior paragraphs in this Complaint as though repeated herein.

128. Defendants and their employees, officials, agents, and representatives, repeatedly treated other similarly situated parties who applied for the Michigan Film Tax Credit differently and more favorably than Plaintiff.

129. Pursuant to the Michigan Business Tax Act, MCL 208.1455—particularly MCL 208.1455(4), and the Fourteenth Amendment to the United States Constitution, Defendants had an obligation to apply the required decision factors for the Michigan Film Tax Credit rebate equally with regard to all similarly situated parties—that is, all applicants for the Michigan Film Tax Credit.

130.  Instead, however, as stated, *supra*, Defendants did not apply the required decision factors, as detailed in MCL 208.1455(4), fairly or, apparently, at all, turning the application approval process into a situation of favoritism for preferred movie stars, such as Drew Barrymore and Clint Eastwood, preferred production companies, preferred religions, and other arbitrary and capricious preferences, in violation of the express language of MCL 208.1455(4).

131.  As stated, *supra*, Plaintiff met and exceeded all five required factors detailed

in MCL 208.1455(4), while many—if not most—productions approved for the Michigan

Film Tax Credit rebate do not meet even one such requirement, much less all of them.

132.  In contrast, many of the approved productions, which received the Michigan

Film Tax Credit, are sleazy, straight-to-video, amateurish productions that have barely

seen the day of light in the mind of the viewing public.  Many reflect very poorly on the

State of Michigan, and many do not even reflect that they are filmed in Michigan.

133.  Defendants' denial of the Michigan Film Tax Credit to Plaintiff,

while granting it to said other vastly unqualified productions, is a blatant example of

Defendants' unequal treatment of similarly situated parties in applying the Michigan

Business Tax Act, MCL 208.1455.

134.  Defendants' denial of the Michigan Film Tax Credit to Plaintiff, while

granting it to said other vastly unqualified productions, is a clear and egregious violation

of Plaintiff's and Plaintiff's sole member, Sandy Frank's right to Equal Protection under

the law, pursuant to the Fourteenth Amendment of the United States Constitution.

135.As a direct and proximate result of Defendants' violation of Plaintiff's

Fourteenth Amendment Equal Protection rights, Plaintiff has suffered irreparable harm

entitling it to declaratory and injunctive relief and damages as set forth in the common

allegations of this Complaint.

### EIGHTH CLAIM FOR RELIEF
### Due Process—Fourteenth Amendment

136.  Plaintiffs re-allege and incorporate by reference all prior paragraphs in this

Complaint as though repeated herein.

137. As a direct and proximate result of the aforementioned policy, practice,

custom, and usage, acts and omissions, engaged in under color of State law, Defendants have violated Plaintiffs' clearly established Due Process rights guaranteed under the Fourteenth Amendment to the United States Constitution, in that Defendants' polices are vague, overbroad, and lack sufficient standards and safeguards to curtail the discretion of MI Film and other State of Michigan officials, thereby allowing Defendants and their employees unbridled discretion to enforce and apply the Michigan Film Tax Credit, under Business Tax Act, MCL 208.1455, in an *ad hoc* and discriminatory manner.

138.  Defendants, including MI Film employees and other State of Michigan officials arbitrarily and capriciously denied Plaintiff SFP LLC's Michigan Film Tax Credit Application, absent notice and a legitimate opportunity to be heard, in violation of its liberty interests and in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

139.As a direct and proximate result of Defendants' violations of the Due Process Clause of the Fourteenth Amendment, Plaintiff has suffered irreparable harm, including loss of its Constitutional rights, entitling it to declaratory and injunctive relief and damages as set forth in the common allegations of this Complaint.

WHEREFORE, by virtue of the foregoing, there exists an actual and justiciable controversy between SFP LLC and Defendants, and this Honorable Court should enter a declaratory judgment in favor of SFP LLC and against Defendants, as requested by SFP LLC in this Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Sandy Frank Productions LLC respectfully requests that this Honorable Court:

(a) Enter judgment in favor of Plaintiff and against Defendants;

(b) Find and Declare that Defendants' Interpretation of the Michigan Business Tax Act, MCL 208.1455 violates the Film Tax Credit;

(c) Find and Declare that Defendants' Denial of the Michigan Film Production Tax Credit to Plaintiff violates the Michigan Business Tax Act, MCL 208.1455;

(d) Find and Declare that Defendants' Denial of the Michigan Film Production Tax Credit to Plaintiff constitutes a violation of the Michigan Administrative Procedures Act, MCL 24.201 Et Seq.;

(e) Find and Declare that Defendants' Denial of the Michigan Film Production Tax Credit to Plaintiff constitutes unjust enrichment;

(f) Find and Declare that Defendants' Denial of the Michigan Film Production Tax Credit to Plaintiff constitutes breach of contract;

(g) Find and Declare that Defendants' Denial of the Michigan Film Production Tax Credit to Plaintiff constitutes breach of implied contract;

(h) Find and Declare that Defendants' Denial of the Michigan Film Production Tax Credit to Plaintiff constitutes fraud and misrepresentation;

(i) Find and Declare that Defendants' Denial of the Michigan Film Production Tax Credit to Plaintiff constitutes a violation of Plaintiff's Fourteenth Amendment Right to Equal Protection under the law;

(j)  Find and Declare that Defendants' Denial of the Michigan Film Production

Tax Credit to Plaintiff constitutes a violation of Plaintiff's Fourteenth

Amendment Right to Due Process under the law;

(k)  Award all appropriate damages, including nominal, compensatory, and

punitive damages, attorney's fees, costs, and interest against Defendants; and

(l)  Grant Plaintiff such further and other relief as the Court deems appropriate;

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby

demands a trial by jury of all issues triable of right by a jury.


Respectfully submitted,



By: s/Deborah K. Schlussel
Deborah K. Schlussel (P56420)
Law Offices of Debbie Schlussel
29477 Laurel Woods Drive
Southfield, MI  48034
(248) 354-1409
WriteDebbie@gmail.com


Dated:  March 9, 2011